**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION**

| | | |
|---|---|---|
| PAUL PARSHALL, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. _____ |
| v. | ) ) | JURY TRIAL DEMANDED |
| WCI COMMUNITIES, INC., STEPHEN D. PLAVIN, PATRICK J. BARTELS, JR., KEITH E. BASS, MICHELLE MACKAY, DARIUS G. NEVIN, CHARLES C. REARDON, CHRISTOPHER E. WILSON, LENNAR CORPORATION, MARLIN BLUE LLC, and MARLIN GREEN CORP., | ) ) ) ) ) ) ) ) | CLASS ACTION |
| Defendants. | ) ) | |

**CLASS ACTION COMPLAINT FOR VIOLATION OF THE
SECURITIES EXCHANGE ACT OF 1934 AND DEMAND FOR JURY TRIAL**

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1.      This action stems from a proposed transaction announced on September 22, 2016 (the "Proposed Transaction"), pursuant to which WCI Communities, Inc. ("WCI" or the "Company") will be acquired by Lennar Corporation ("Parent") and its wholly-owned subsidiaries, Marlin Blue LLC and Marlin Green Corp. (together with Parent, "Lennar").

2.      On September 22, 2016, WCI's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement").  Pursuant to the terms of the Merger Agreement, shareholders of WCI will receive

$11.75 in cash and a fraction of a share of Lennar Class A common stock valued at $11.75.

3.     On November 10, 2016, defendants filed a Form S-4 Registration Statement (the "Registration Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4.     As set forth herein, the Registration Statement omits material information with respect to the Proposed Transaction, which renders the Registration Statement false and misleading.  Accordingly, plaintiff alleges that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Registration Statement.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6.     This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of WCI common stock.

9.     Defendant WCI is a Delaware corporation and maintains its principal executive offices at 24301 Walden Center Drive, Bonita Springs, Florida 34134.  WCI's common stock is traded on the NYSE under the ticker symbol "WCIC."

10.    Defendant Stephen D. Plavin ("Plavin") is a director of WCI and has served as Chairman of the Board since August 2009.  According to the Company's website, Plavin is a member of the Compensation Committee.

11.    Defendant Patrick J. Bartels, Jr. ("Bartels") has served as a director of WCI since August 2009.  According to the Company's website, Bartels is a member of the Compensation Committee, the Nominating and Corporate Governance Committee, and the Land Committee. Bartels was nominated to the Board, the Compensation Committee, the Nominating and Corporate Governance Committee, and the Land Committee by Monarch Alternative Capital LP and certain of its affiliates (collectively, "Monarch"), one of the Company's two largest shareholders.  Bartels has been a Managing Principal at Monarch since approximately 2002.

12.    Defendant Keith E. Bass ("Bass") has served as a director of WCI since March 2012 and as President and Chief Executive Officer ("CEO") since December 2012.  According to the Company's website, Bass is Chair of the Land Committee.  Bass stands to receive approximately $4.15 million in retention and transaction bonuses in connection with the Proposed Transaction.

13.    Defendant Michelle MacKay ("MacKay") has served as a director of WCI since August 2009.  According to the Company's website, MacKay is Chair of the Nominating and Corporate Governance Committee and a member of the Audit Committee.

14.    Defendant Darius G. Nevin ("Nevin") has served as a director of WCI since July 2013.  According to the Company's website, Nevin is Chair of the Audit Committee and a

member of the Land Committee.  Nevin was nominated to the Board and the Audit Committee by Monarch.

15.     Defendant Charles C. Reardon ("Reardon") has served as a director of WCI since July 2013.  According to the Company's website, Reardon is a member of the Audit Committee and the Nominating and Corporate Governance Committee.  Reardon was nominated to the Board, the Audit Committee, and the Nominating and Corporate Governance Committee by Stonehill Capital Management LLC and certain of its affiliates (collectively, "Stonehill"), one of the Company's two largest shareholders.

16.     Defendant Christopher E. Wilson ("Wilson") has served as a director of WCI since July 2012.  According to the Company's website, Wilson is Chair of the Compensation Committee and a member of the Land Committee.  Wilson was nominated to the Board, the Compensation Committee, and the Land Committee by Stonehill.  Wilson has been a Partner at Stonehill since 1995.

17.     The defendants identified in paragraphs 10 through 16 are collectively referred to herein as the "Individual Defendants."

18.     Defendant Parent is a Delaware corporation and maintains its principal executive offices at 700 Northwest 107th Avenue, Miami, Florida 33172.

19.     Defendant Marlin Blue LLC is a Delaware limited liability company, a wholly-owned subsidiary of Parent, and a party to the Merger Agreement.

20.     Defendant Marlin Green Corp. is a Delaware corporation, a wholly-owned subsidiary of Parent, and a party to the Merger Agreement.

## CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of WCI (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

22.     This action is properly maintainable as a class action.

23.     The Class is so numerous that joinder of all members is impracticable.  As of March 22, 2016, there were approximately 26,339,688 shares of WCI common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

24.     Questions of law and fact are common to the Class, including, among others:  (i) whether defendants violated the 1934 Act; and (ii) whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

25.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class.  Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

26.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the

adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

27.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

### *Background of the Company*

28.     WCI is a lifestyle community developer and luxury homebuilder of single- and multi-family homes in most of coastal Florida's highest growth and largest markets, in which the Company owned or controlled approximately 13,300 home sites at year end 2015.

29.     WCI has established a reputation and strong brand recognition for developing amenity rich, lifestyle oriented master-planned communities and, including its predecessor companies, has a legacy that spans more than 60 years.

30.     The Company's homes and communities are primarily targeted to move-up, second home, and active adult buyers.

31.     On July 27, 2016, WCI issued a press release wherein it reported its results for the second quarter of 2016.  The Company delivered 307 homes in the second quarter of 2016, an increase of 64 units, or 26.3%, from the prior-year quarter.  The Company generated total revenues of $167.4 million for the quarter ended June 30, 2016, an increase of $16.7 million, or 11.1%, compared to $150.7 million in the second quarter of 2015.  Compared to the prior-year quarter, Homebuilding revenues grew 14.2% and Real Estate Services revenues grew 4.5%.

32.     With respect to the results, Individual Defendant Bass, President and CEO of the Company, commented:

I am pleased with our second quarter results as we increased deliveries, total revenues and new order average selling prices despite some unevenness in our markets during the spring selling season.  Overall, we believe the Florida housing market remains healthy and are optimistic that the state will continue to demonstrate sound demographic, economic and real estate fundamentals on which we are well-positioned to capitalize on in the future.

***Flawed Process Leading Up to the Merger Agreement***

33.     As set forth in the Registration Statement, the Proposed Transaction is the result of a flawed process led by Individual Defendant Bass, who has been promised millions of dollars in retention and transaction bonuses in connection with the Proposed Transaction, and WCI's conflicted financial advisor, Citigroup Global Markets Inc. ("Citi"), which advised ***Lennar*** in April and May 2016 regarding the proposals it should make to acquire WCI.  While the Board engaged a second financial advisor at the eleventh hour, Credit Suisse Securities (USA) LLC ("Credit Suisse"), Credit Suisse also has significant ties to Lennar.

34.     On May 4, 2016, Citi met with representatives of Stonehill, one of the Company's two largest shareholders, including Individual Defendant Wilson, who has been a Partner at Stonehill since 1995 and was nominated to the Board by Stonehill.  Both Stonehill and Monarch, the Company's other largest shareholder, have previously expressed interest in liquidating their equity positions in WCI, and both entities sold shares of WCI in secondary offerings or in the open market three times during 2015.  Citi and Wilson subsequently met telephonically regarding Lennar's potential interest in a transaction with WCI.

35.     Also on May 4, Lennar contacted Citi to gauge WCI's interest in a possible transaction with Lennar.

36.     On May 12, 2016, Bass and Rick Beckwitt ("Beckwitt"), President of Lennar, met telephonically and scheduled an in-person meeting for May 18, 2016.

37.     The next day, WCI and Lennar entered into a nondisclosure agreement on "customary terms, including customary non-solicitation and standstill provisions."

38.     On May 18, 2016, Bass and Beckwitt met in person and Beckwitt indicated that Lennar was considering a proposal to acquire the Company for $20.00 per share.

39.     Two days later, Beckwitt contacted Bass and indicated that Lennar was interested in acquiring WCI for $20.00 per share, payable 100% in Lennar Class A stock.  Bass suggested that Lennar increase its proposed purchase price to *at least* $25.00 per share – significantly higher than the ultimate merger consideration.  Bass and Beckwitt spoke again on May 24.

40.     On May 31, 2016, the Board met and determined that Bass would lead the negotiations with Lennar, despite the fact that Bass has been promised substantial retention and transaction bonuses in connection with the Proposed Transaction.  The Board also formed a "Transaction Committee," comprised of four undisclosed directors.  However, the Transaction Committee was "never needed or utilized" during the process leading up to the Merger Agreement.  Instead, conflicted Bass subsequently negotiated the terms of the Proposed Transaction.

41.     On August 4, 2016, Beckwitt submitted a proposal on behalf of Lennar to acquire WCI for $22.50 per share, which Lennar ultimately revised to $23.50 per share in cash and Lennar stock.

42.     On August 10, 2016, the Board determined not to reach out to other potentially interested bidders prior to executing a merger agreement with Lennar.

43.     On September 14, 2016, WCI's management discussed "certain updates regarding the impact on the [Company's] Five-Year Plan and assumptions of WCI's updated budget for 2016 and an expectation for a potential reduction in revenue and earnings for 2017 with respect

to WCI's residential tower and homebuilding businesses."  The Board then authorized Citi to use and rely upon a set of revised Company financial projections for purposes of its financial analyses and opinion (the "September 14 Projections").

44.    On September 16, 2016, six days before the parties executed the Merger Agreement, Citi informed the Board that, in April and May 2016, Citi had provided materials to *Lennar* regarding the potential acquisition of WCI, which "included indicative analyses of the potential impact of a transaction at illustrative price levels ranging from $23.00 to $27.00 per share and $20.00 to $25.00 per share, respectively."  The materials dated April 7, 2016 included "a business and financial overview of WCI, certain market statistics, relative contributions to various market and financial measures, and implied premia and financial metrics and illustrative transaction overview and potential pro forma financial impact on Lennar at various prices ranging from $23.00 to $27.00 per share of WCI common stock."  Materials dated May 5, 2016 contained similar information but "with the ***illustrative price range adjusted downward to $20.00*** to $25.00 per share of WCI common stock."  (Emphasis added).  Not coincidentally, Lennar's first proposal to acquire WCI, which was submitted on May 20, was for $20.00 per share.  Notably, Lennar did not hire its own financial advisor in connection with the Proposed Transaction, and apparently only relied upon the information and analyses provided by Citi.

45.    Nevertheless, the Board received financial analyses and an opinion regarding the purported fairness of the merger consideration from conflicted Citi in connection with the Proposed Transaction, but at the last minute also hired a second financial advisor, Credit Suisse, despite the fact that Credit Suisse met with Lennar in March 2015 "to discuss potential acquisition opportunities, including a potential acquisition of WCI," and that Credit Suisse "was a counterparty to Lennar subsidiaries with respect to two warehouse credit facilities and a

counterparty to Lennar with respect to a $55 million credit default swap backed letter of credit facility." Credit Suisse has also provided past services to Stonehill and Monarch in connection with their sales of WCI common stock.

46. On September 21, 2016, WCI's management made further adjustments to its financial projections, which WCI management authorized Credit Suisse to use and rely on for purposes of its financial analyses (the "September 21 Projections"). It does not appear that management or the Board instructed Citi to rely upon the same projections, which instead relied upon the September 14 Projections.

47. On September 21, 2016, Citi informed the Board of additional discussions it previously had with Lennar regarding the proposed acquisition of WCI.

48. The next day, Citi and Credit Suisse presented their financial analyses and opinions to the Board, and the Board approved the Proposed Transaction. The parties executed the Merger Agreement that day.

49. On October 3, 2016, Lennar called Credit Suisse regarding Credit Suisse participating in Lennar's general corporate credit facility. Lennar also approached Credit Suisse's debt capital markets group regarding increasing the amount of Lennar's existing $55 million credit default swap backed credit facility.

50. On October 14, 2016, the Board met and WCI's management discussed the September 21 Projections, specifically that "a computational error had been discovered in WCI management's estimates related to customer deposits that, when corrected, resulted in a change to the 2017 cash flow forecast of WCI." WCI management prepared an updated financial model taking into account the effect of the correction and "other adjustments" (the "October 2016 Projections").

51.     When WCI informed Citi and Credit Suisse of the computational error, Citi informed WCI that it relied upon the September 14 Projections, as opposed to September 21 Projections, in connection with its analyses.   While Credit Suisse relied upon the erroneous September 21 Projections, Credit Suisse purportedly would still have been able to render its opinion that the merger consideration was fair based on the October 2016 Projections.   Citi also determined that the October 2016 Projections "would not have changed the conclusion reached in Citi's opinion as of the date it was rendered."

### The Preclusive Merger Agreement

52.     Despite a limited and inadequate post-signing "go-shop period," pursuant to which WCI and its representatives could contact certain potentially interested bidders (and which resulted in *no* superior acquisition proposals), the Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals.   Section 5.6(a) of the Merger Agreement states, in relevant part:

> (a) After the end of the Transaction Solicitation Period, except as otherwise provided in Section 5.6(b), the Company shall, except, in each case, with respect to any Excluded Party, (i) terminate all ongoing discussions regarding Acquisition Proposals or otherwise regarding possible Acquisition Transactions and (ii) not authorize or permit its or any of its Subsidiaries' officers, directors, employees, agents or other Representatives (including any investment banker, attorney or accountant acting on behalf of the Company or by any of the Subsidiaries of the Company), directly or indirectly, to initiate, solicit, knowingly encourage or otherwise knowingly facilitate (by making available non-public information or otherwise) any Acquisition Proposal or any inquiry, proposal or offer with respect to a possible Acquisition Transaction. . . .

53.     Further, the Company must advise Lennar, within two business days, of any proposals or inquiries received from other parties.  Section 5.6(c) of the Merger Agreement states:

> (c) If at any time after the end of the Transaction Solicitation Period, the Company receives an Acquisition Proposal, a request for non-public information in connection with an Acquisition Proposal or an indication that a Prospective Acquirer intends to make an Acquisition Proposal, as promptly as practicable, and in any event within two Business Days, after the Company receives such Acquisition Proposal, request for non-public information or indication of intent to make an Acquisition Proposal, the Company will inform Parent about such Acquisition Proposal, request or indication, including the identity of the Prospective Acquirer from which the Acquisition Proposal, request or indication was received, and a reasonably detailed description of its material terms, and the Company will promptly, from time to time, provide Parent with any additional material information the Company obtains regarding the Acquisition Proposal, request or indication, including information about steps that are taken in response to it or in furtherance of a possible Acquisition Transaction.

54.     Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants Lennar a "matching right" with respect to any "Superior Proposal" made to the Company.  Section 5.6(b) of the Merger Agreement provides:

> (b) Notwithstanding anything to the contrary set forth in Section 5.6(a) or elsewhere in this Agreement, the Company, its Subsidiaries and their respective Representatives may . . . (ii) execute and enter into a binding agreement, on such terms and conditions as the Company Board may determine (an "Alternative Acquisition Agreement"), with respect to an Acquisition Proposal that the Company Board determines constitutes a Superior Proposal; provided that any Alternative Acquisition Agreement must expressly provide that the Company may terminate such Alternative Acquisition Agreement without cost to the Company, and the Company will not have any obligations or be subject to any restrictions under or as a result of the Alternate Acquisition Agreement in the event Parent agrees, pursuant to the terms of Section 7.1(d)(ii), to amend the terms and conditions of this Agreement so that such Acquisition Proposal would cease to constitute a Superior Proposal.

Section 7.1(d) further provides:

This Agreement may be terminated at any time prior to the First Effective Time (whether or not the Company's stockholders have adopted this Agreement): . . .

(d) By the Company if: . . .

(ii) Prior to the receipt of the Company Stockholder Approval, (A) the Company receives an Acquisition Proposal that the Company Board determines constitutes a Superior Proposal, (B) at least three Business Days prior to the termination of this Agreement, the Company gives Parent and the Merger Subs a notice (a "Superior Proposal Termination Notice") (x) including a copy of an Alternative Acquisition Agreement or a final draft of such an agreement with respect to such Acquisition Proposal, (y) stating what the Company Board has determined in good faith to be the value per share of Company Common Stock of the consideration the Company's stockholders would receive as a result of the Superior Proposal and (z) stating that unless Parent agrees to amend the terms and conditions of this Agreement so that such Acquisition Proposal would cease to constitute a Superior Proposal, this Agreement will terminate on a date set forth in the Superior Proposal Termination Notice (which will be no earlier than the day after the expiration of the three Business Day notice period (or two Business Day notice period for a new Superior Proposal Termination Notice, if applicable)), (C) during such three Business Day period (or such two Business Day period for a new Superior Proposal), the Company negotiates with Parent in good faith (if Parent desires to negotiate) regarding changes to the terms and conditions in this Agreement that would cause the transaction that is the subject of this Agreement to be at least as favorable to the holders of the Company Common Stock as the Acquisition Proposal it has determined to be a Superior Proposal (including describing to Parent how the Company Board values the components of the Acquisition Proposal it has determined constitutes a Superior Proposal, how the Company Board values the components of the Merger Consideration, and all other respects in which the Company Board believes the Acquisition Proposal is or may be more favorable to the holders of the Company Common Stock than this Agreement), (D) Parent fails to agree by the termination date set forth in the Superior Proposal Termination Notice to amend this Agreement so that, in the good faith judgment of the Company Board, based on the factors described to Parent, the transaction that is the subject of this Agreement as amended would be at least as favorable to the holders of the Company Common Stock as the Acquisition Proposal (and therefore, the Acquisition Proposal no longer constitutes a Superior Proposal), and (E) concurrently with the termination of this Agreement, the Company pays, or causes to be paid, to Parent $11,250,000 (the "Excluded Party Termination Fee") if the Superior Proposal was received by the Company from an Excluded Party, or $22,500,000 (the "Termination Fee") if the Superior Proposal was not received from an Excluded Party; provided that in the event of any material amendment to such Acquisition Proposal that would cause the Company Board to determine that such Acquisition Proposal is a Superior Proposal despite the amendments to this Agreement, if any, that had been agreed to by Parent, the Company shall be required (but only on two additional

occasions) to deliver a new Superior Proposal Termination Notice to Parent and the Merger Subs (provided that any new Superior Proposal Termination Notice need only be given at least two Business Days prior to the termination of this Agreement), which new Superior Proposal Termination Notice shall become the operative Superior Proposal Termination Notice for purposes of this Section 7.1(d)(ii). A Superior Proposal Termination Notice (including a new Superior Proposal Termination Notice) may be revoked by the Company prior to the termination of this Agreement.

55.     Further locking up control of the Company in favor of Lennar, the Merger Agreement provides for a "termination fee" of up to $22.5 million, payable by the Company to Lennar if the Individual Defendants cause the Company to terminate the Merger Agreement.

56.     By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

***Inadequate Merger Consideration and Interests of the Company's Officers and Directors***

57.     The consideration to be provided to plaintiff and the Class in the Proposed Transaction, valued at $23.50 per share, is inadequate.

58.     Among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

59.     The financial analyses performed by WCI's own financial advisors confirm the inadequacy of the merger consideration.  For example, Citi's *Selected Precedent Transactions Analysis* yielded an implied per share equity value as high as $28.70, and Citi's *Discounted Cash Flow Analysis* yielded an implied per share equity value as high as $27.70.  Additionally, Credit Suisse's *Discounted Cash Flow Analysis* yielded an implied per share equity value as high as $28.15.

60.     Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

61.     Meanwhile, certain of the Company's officers and directors stand to receive significant benefits as a result of the Proposed Transaction.

62.     For example, Individual Defendant Bass, as well as Russell Devendorf, WCI's Senior Vice President and Chief Financial Officer, and David T. Ivin, Senior Vice President of Homebuilding and Development and President of the Company's North Region, have entered into agreements pursuant to which they will receive retention bonuses in connection with the Proposed Transaction amounting to approximately $3.46 million.

63.     Additionally, Bass will receive a transaction bonus of $3.22 million payable upon consummation of the Proposed Transaction.

64.     Moreover, the Company's executive officers will be entitled to substantial payments as a result of their employment agreements.

***The Registration Statement Omits Material Information, Rendering It False and Misleading***

65.     Defendants filed the Registration Statement with the SEC in connection with the Proposed Transaction.

66.     The Registration Statement omits material information regarding the Proposed Transaction, which renders the Registration Statement false and misleading.

67.     First, the Registration Statement omits material information regarding potential conflicts of interest of the Company's officers and directors.

68.     For example, while the Registration Statement states that there were "frequent conversations" between Bass and Beckwitt regarding "matters related to compensation of WCI

15

executives, including retention agreements, benefit plans and increased severance benefits," the Registration Statement fails to disclose the timing and nature of such conversations, including when the first discussion regarding such matters took place.

69.     The Registration Statement also fails to disclose the timing and nature of all communications regarding future employment and/or directorship of WCI's officers and directors, including who participated in all such communications.

70.     This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

71.     The omission of this material information renders the Registration Statement false and misleading, including, *inter alia*, the following sections of the Registration Statement:  (i) "Interests of WCI Directors and Executive Officers in the Initial Merger"; (ii) "WCI Board Recommendation and Its Reasons for the Mergers"; and (iii) "Background of the Mergers."

72.     Second, the Registration Statement omits material information regarding the financial analyses performed by Citi and Credit Suisse in support of their so-called fairness opinions.

73.     For example, with respect to Citi's *Discounted Cash Flow Analysis*, the Registration Statement fails to disclose:  (i) the specific definition of unlevered, after-tax free cash flow used by Citi in this analysis, as well as the projections of each of the items used in the calculation of unlevered, after-tax free cash flow; (ii) the initial total amount of WCI's net operating loss carryforwards utilized in the analysis, as well as their projected annual utilization; (iii) descriptions and amounts of WCI's "other tax attributes"; (iv) projections of WCI's

"adjusted inventory"; (v) Citi's basis for selecting a range of adjusted inventory multiples of 1.0x to 1.1x; (vi) the inputs and assumptions underlying the weighted average cost of capital calculation; and (vii) the unlevered, after-tax free cash flows attributable to WCI's luxury high-rise tower business and corresponding definition.

74.    With respect to Citi's *Selected Public Companies Analysis*, the Registration Statement fails to disclose the individual multiples for the selected companies observed by Citi in its analysis.

75.    With respect to Citi's *Selected Precedent Transactions Analysis*, the Registration Statement fails to disclose the individual multiples for the selected transactions observed by Citi in its analysis, and Citi's rationale for restricting this analysis to only consider book value multiples.

76.    With respect to Credit Suisse's *Discounted Cash Flow Analysis*, the Registration Statement fails to disclose:  (i) the specific definition of unlevered, after-tax free cash flow used by Credit Suisse in this analysis, as well as the projections of each of the items used in the calculation of unlevered, after-tax free cash flow, including the "Estimated Tax Savings"; (ii) projections of WCI's estimated inventory; (iii) Credit Suisse's basis for selecting a range of terminal estimated inventory multiples of 0.90x to 1.10x; and (iv) the inputs and assumptions underlying the weighted average cost of capital calculation.

77.    With respect to Credit Suisse's *Selected Companies Analysis*, the Registration Statement fails to disclose the individual multiples for the selected companies observed by Credit Suisse in its analysis.

78.    The Registration Statement also fails to disclose a fair summary of Credit Suisse's selected precedent transactions analysis, or the basis for Credit Suisse's failure to perform such

standard analysis, as well as an explanation of the following statement: "No company, business or *transaction* used in Credit Suisse's analyses for comparative purposes is identical to WCI, Lennar or the proposed mergers." (Emphasis added).

79.     When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed. Moreover, the disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisors in support of their fairness opinions.

80.     The omission of this material information renders the Registration Statement false and misleading, including, *inter alia*, the following sections of the Registration Statement: (i) "Opinions of WCI's Financial Advisors"; (ii) "Certain Unaudited Financial and Operating Forecasts Prepared by the Management of WCI"; (iii) "WCI Board Recommendation and Its Reasons for the Mergers"; and (iv) "Background of the Mergers."

81.     Third, the Registration Statement omits material information regarding potential conflicts of interest of the Company's financial advisors.

82.     The Registration Statement provides that "WCI may pay Credit Suisse an additional fee in its sole discretion regardless of whether the proposed mergers with Lennar or an Alternate Transaction is consummated." However, the Registration Statement fails to disclose under what circumstances this "additional fee" may be paid, as well as the amount of such fee. The Registration Statement similarly fails to disclose the amounts of the "additional opinion fee" and "transaction fee" potentially payable to Credit Suisse.

83.     Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.  This information is particularly material here, as the Board's first financial advisor, Citi, suffered from substantial conflicts of interest.

84.     The omission of this material information renders the Registration Statement false and misleading, including, *inter alia*, the following sections of the Registration Statement:  (i) "Opinions of WCI's Financial Advisors"; (ii) "WCI Board Recommendation and Its Reasons for the Mergers"; and (iii) "Background of the Mergers."

85.     Fourth, the Registration Statement omits material information regarding the background of the Proposed Transaction.  The Company's stockholders are entitled to an accurate description of the "process" the directors used in coming to their decision to support the Proposed Transaction.

86.     For example, the Registration Statement fails to disclose whether the nondisclosure agreements entered into between WCI and the potential bidders contained standstill and/or "don't ask, don't waive" provisions.

87.     The Registration Statement fails to disclose WCI management's and the Board's basis for instructing Citi to rely upon the September 14 Projections for its financial analyses, but instructing Credit Suisse to instead rely upon the September 21 Projections for its financial analyses.

88.     The Registration Statement fails to disclose WCI management's and the Board's basis for providing the "Five-Year Plan," September 21 Projections, and October 2016 Projections to potential bidders, but apparently not providing the September 14 Projections to

those parties, despite the fact that Citi relied upon the September 14 Projections in connection with its analyses.

89.     The Registration Statement fails to disclose the reasons Lennar apparently did not engage a financial advisor in connection with the Proposed Transaction.

90.     The Registration Statement also fails to disclose the members of the Transaction Committee.

91.     The omission of this material information renders the Registration Statement false and misleading, including, *inter alia*, the following sections of the Registration Statement: (i) "Opinions of WCI's Financial Advisors"; (ii) "Certain Unaudited Financial and Operating Forecasts Prepared by the Management of WCI"; (iii) "WCI Board Recommendation and Its Reasons for the Mergers"; and (iv) "Background of the Mergers."

92.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to WCI's stockholders.

## COUNT I

**Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and WCI**

93.     Plaintiff repeats and realleges paragraphs 1 through 92 as if fully set forth herein.

94.     The Individual Defendants disseminated the false and misleading Registration Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading.  WCI is liable as the issuer of these statements.

95.     The Registration Statement was prepared, reviewed, approved, and/or disseminated by the Individual Defendants.  By virtue of their positions within the Company, the

Individual Defendants were aware of this information and their duty to disclose this information in the Registration Statement.

96.     The Individual Defendants were at least negligent in filing the Registration Statement with these materially false and misleading statements.

97.     The omissions and false and misleading statements in the Registration Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Registration Statement and in other information reasonably available to stockholders.

98.     The Registration Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

99.     By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

100.    Because of the false and misleading statements in the Registration Statement, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

### Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants and Lennar

101.    Plaintiff repeats and realleges paragraphs 1 through 100 as if fully set forth herein.

102.    The Individual Defendants and Lennar acted as controlling persons of WCI within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of WCI and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Registration Statement, they had the power to influence and control and did influence and control, directly or

indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

103.    Each of the Individual Defendants and Lennar was provided with or had unlimited access to copies of the Registration Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

104.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.   The Registration Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.   They were thus directly in the making of the Registration Statement.

105.    Lennar also had direct supervisory control over the composition of the Registration Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Registration Statement.

106.    By virtue of the foregoing, the Individual Defendants and Lennar violated Section 20(a) of the 1934 Act.

107.    As set forth above, the Individual Defendants and Lennar had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein.   By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.   As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.     Ordering that this action may be maintained as a class action and certifying plaintiff as the Class representative and plaintiff's counsel as Class counsel;

B.     Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

C.     In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

D.     Directing the Individual Defendants to disseminate a Registration Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

E.     Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

F.     Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

G.     Granting such other and further relief as this Court may deem just and proper.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: November 22, 2016

**THE POLASZEK LAW FIRM, PLLC**

By: */s/ Christopher S. Polaszek*

Christopher S. Polaszek
Florida Bar No. 0116866
3407 W. Kennedy Blvd.
Tampa, FL 33609
Tel.:  (813) 574-7678
E-mail:  chris@polaszeklaw.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**RIGRODSKY & LONG, P.A.**
Brian D. Long
Gina M. Serra
2 Righter Parkway, Suite 120
Wilmington, DE 19803
Tel.:  (302) 295-5310

**RYAN & MANISKAS, LLP**
Richard A. Maniskas
995 Old Eagle School Road, Suite 311
Wayne, PA 19087
Tel.:  (484) 588-5516